United States District Court
Southern District of Texas

**ENTERED**

January 23, 2019

David J. Bradley, Clerk

IN TE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ELIZABETH AGUIRRE, ABID MOMIN, and KASSIRIM ONYERI, | § § § | |
| Plaintiffs, | § § | |
| V. | § § | CIVIL ACTION NO. H-15-3722 |
| VALERUS FIELD SOLUTIONS, L.P., SNC-LAVALIN GROUP, INC., GARLAND BRYAN KING, IV, and LAWRENCE SCOTT MCKINNON, | § § § § § | |
| Defendants. | § § | |

## MEMORANDUM AND RECOMMENDATION

Pending in this case that has now been referred to the Magistrate Judge are three Motions for Summary Judgment: Defendants' Motion for Summary Judgment Against Plaintiff Elizabeth Aguirre (Document No. 68); Defendants' Motion for Summary Judgment Against Plaintiff Kassirim Onyeri (Document No. 69); and Defendant Valerus Field Solution, L.P.'s Motion for Summary Judgment Against Abid Momin (Document No. 70). Having considered those motions, the responses in opposition, the parties' additional briefing, the summary judgment evidence, and the applicable law, the Magistrate Judge RECOMMENDS, for the reasons set forth below, that Defendants' Motion for Summary Judgment Against Plaintiff Elizabeth Aguirre (Document No. 68) be GRANTED; Defendants' Motion for Summary Judgment Against Plaintiff Kassirim Onyeri (Document No. 69) be GRANTED; and Defendant Valerus Field Solution, L.P.'s Motion for Summary Judgment Against Abid Momin (Document No. 70) be GRANTED in PART and DENIED in PART.

## I.    Background

This employment case was filed by three former employees of Valerus Field Solutions LP ("Valerus"), each of whom was employed in the Supply Chain Division, and each of whom claims to have suffered various forms of discrimination and retaliation.  Plaintiff Elizabeth Aguirre ("Aguirre"), a Hispanic female, alleges claims against Valerus of race and national origin discrimination, harassment and hostile work environment under Title VII; disparate treatment and disparate impact sex discrimination under Title VII; retaliation under Title VII; and race discrimination under 42 U.S.C. § 1981.  She also asserts claims against Valerus, and Defendants Garland Bryan King ("King") and Lawrence Scott McKinnon ("McKinnon") for  violations of the Equal Pay Act ("EPA") and retaliation under the EPA.   Plaintiff Kassirim Onyeri ("Onyeri"), an African-American female, similarly asserts claims against Valerus for race and national origin harassment and discrimination under Title VII, disparate treatment and disparate impact sex discrimination under Title VII, and retaliation under Title VII; disability discrimination under the Americans with Disabilities Act ("ADA"), and race discrimination under § 1981; she also asserts claims against Valerus, King and McKinnon for  violations of the EPA, and retaliation under the EPA.  Plaintiff Abid Momin, an Indian-American male, asserts claims against Valerus for race and national origin harassment and discrimination under Title VII, retaliation under Title VII, and race discrimination under § 1981.

Defendants have filed Motions for Summary Judgment on each Plaintiff's claims.  Given the number and nature of the claims, as well as the timing of the alleged discrimination, harassment, and retaliation, the law applicable to Plaintiffs' collective claims will be set out first, and will be followed by a separate discussion of each Plaintiff's particular claims.

## II.     Summary Judgment Standard

Rule 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  The moving party must initially "demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 106 S. Ct. 2548, 2553 (1986).  Once the moving party meets its burden, the burden shifts to the nonmovant, "who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists" and that summary judgment should not be granted. *Norwegian Bulk Transp. A/S v. Int'l Marine Terminals P'ship.*, 520 F.3d 409, 412 (5ᵗʰ Cir. 2008); *see also Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998).[1]  A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials in a pleading, and unsubstantiated assertions that a fact issue exists will not suffice. *Celotex*, 106 S. Ct. at 2548.  Instead, "the nonmoving party must set forth specific facts showing the existence of a 'genuine' issue concerning every essential component of its case." *Morris*, 144 F.3d at 380.

In considering a motion for summary judgment, all reasonable inferences to be drawn from both the evidence and undisputed facts are to be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 106 S. Ct. 1348, 1356 (1986).  "If the record, viewed in this light, could not lead a rational trier of fact to find" for the nonmovant, then summary judgment is proper. *Kelley v. Price- Macemon, Inc.*, 992 F.2d 1408, 1413 (5th Cir. 1993)

---

[1] Where "the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record contains insufficient proof concerning an essential element of the nonmoving party's claim." *Norwegian Bulk Transport A/S v. International Marine Terminals Partnership*, 520 F.3d 409, 412 (5ᵗʰ Cir. 2008).

(citing *Matsushita*, 106 S. Ct. at 1351).  On the other hand, if "the factfinder could reasonably find in [the nonmovant's] favor, then summary judgment is improper." *Id.*  Even if the standards of Rule 56 are met, a court has discretion to deny a motion for summary judgment if it believes that "the better course would be to proceed to a full trial." *Anderson*, 106 S. Ct. at 2513.

## III.    Applicable Law

### A.    Title VII

Title VII prohibits an employer from discharging or otherwise discriminating against any individual because of such individual's race, color, religion, sex, or national origin, 42 U.S.C. § 2000e-2(a)(1).  Title VII also proscribes an employer from retaliating against an employee for opposing an unlawful employment practice.  42 U.S.C. § 2000e-3.  Actionable employment discrimination under Title VII can be based on disparate treatment, disparate impact, and/or a hostile work environment. *Barnes v. McHugh*, Civil Action No. 12-2491, 2013 WL 3561679 *11 (E.D. La. July 11, 2013) ("A plaintiff can assert 'status-based' Title VII claims under 42 U.S.C.A. § 2000e–2(a) and (k), 'retaliation' claims under 42 U.S.C.A. § 2000e–3, and 'hostile work environment' claims, both for status-based discrimination and retaliation. Title VII status-based discrimination claims are divided into two categories: 'disparate treatment' claims pursuant to § 2000e–2(a)(1), and 'disparate impact' claims pursuant to 2000e–2(k)").

### 1.    Disparate Treatment Discrimination

For the first type of discrimination – that based on disparate treatment –   a plaintiff must either offer direct evidence of discrimination or utilize the indirect method of proof set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *See Taylor v. Principal Fin. Grp.,*

*Inc.*, 93 F.3d 155, 162 (5th Cir.), *cert. denied*, 519 U.S. 1029 (1996); *Daigle v. Liberty Life Ins. Co.*, 70 F.3d 394, 396 (5th Cir. 1995).

"Direct evidence of discrimination is evidence which, if believed, would prove the existence of a fact (i.e., unlawful discrimination) without any inferences or presumptions." *Bodenheimer v. PPG Indus. Inc.*, 5 F.3d 955, 958 (5th Cir. 1993). For a statement to suffice as direct evidence of discrimination, the statement must directly suggest the existence of bias and must not be subject to interpretation as anything other than a reflection of bias. *See Mooney v. Aramco Svcs. Co.*, 54 F.3d 1207, 1217 (5th Cir. 1995) (citing *Davis v. Chevron U.S.A. Inc.*, 14 F.3d 1082, 1085 (5th Cir. 1994)); *see also Maestas v. Apple, Inc.*, 546 F. App'x 422, 427-28 (5th Cir. 2013) ("A comment demonstrates an employer's discriminatory intent if it is 'direct and unambiguous, allowing a reasonable jury to conclude without any inferences or presumptions that age was an impermissible factor in the decision to terminate the employee.'") (quoting *Moss v. BMC Software, Inc.*, 610 F.3d 917, 929 (5th Cir. 2010)). Workplace comments that are alleged to be direct evidence of discrimination are only considered as such if the comments are: "'1) related to the protected class of persons of which the plaintiff is a member; 2) proximate in time to the complained-of adverse employment decision; 3) made by an individual with authority over the employment decision at issue; and 4) related to the employment decision at issue.'" *Jackson v. Cal-W Packaging Corp.*, 602 F.3d 374, 380 (5th Cir. 2010) (quoting *Rubinstein v. Adm'rs of Tulane Educ. Fund*, 218 F.3d 392, 400-01 (5th Cir. 2000)). If the alleged workplace comment does not meet these four requirements, the comment cannot be considered direct evidence of discrimination, and is treated as a "stray remark." *Id.*

Under the indirect method of proof set forth in *McDonnell Douglas*, a plaintiff must first establish a *prima facie* case of discrimination. A *prima facie* case of disparate treatment

5

discrimination under Title VII requires proof that the plaintiff (1) is a member of a protected class; (2) was qualified for the position; (3) suffered an adverse employment action; and (4) was treated less favorably than those outside the protected class. *Okoye v. Univ. of Tex. Houston Health Science Center*, 245 F.3d 507, 512-13 (5th Cir. 2001); *Rutherford v. Harris Cty.*, 197 F.3d 173, 184 (5th Cir. 1999). For purposes of maintaining a disparate treatment claim under Title VII, § 1981, sex, race, and national origin are all protected classes. 42 U.S.C. § 2000e-et seq; 29 U.S.C. 623(a)(1). A plaintiff is "qualified" for a position if the "objective requirements" for the position are met. *Johnson v. Louisiana*, 351 F.3d 616, 622 (5th Cir. 2003). A plaintiff suffers an adverse employment action when there is "a significant change in [the plaintiff's] employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Butler v. Ysleta Indep. Sch. Dist.*, 161 F.3d 263, 268 (5th Cir. 1998) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. at 761). A plaintiff is treated "less favorably" when the defendant gives preferential treatment to [a member outside the protected class] under 'nearly identical' circumstances." *Little v. Republic Ref. Co., Ltd.*, 924 F.2d 93, 97 (5th Cir. 1991); *see also Aguinaga v. Tex. Alcohol & Beverage Comm'n*, 98 Fed. App'x 328, 331, 2004 WL 1161914 (5th Cir. 2004) (the differing treatment must be under nearly identical circumstances to satisfy the fourth element of a *prima facie* case of disparate treatment).

Once a *prima facie* case has been established, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions. *See McDonnell Douglas,* 411 U.S. at 802. "The defendant's burden during this second step is satisfied by producing evidence, which, '*taken as true*, would *permit* the conclusion that there was a nondiscriminatory reason'" for the defendant's adverse hiring decision. *Price v. Fed. Express Corp.*, 283 F.3d 715, 720 (5th Cir. 2002) (quoting *St.*

6

*Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993) (emphasis in original)).  If the employer

sustains its burden, the *prima facie* case is dissolved, and the burden shifts back to the plaintiff to

establish that the reason proffered by the employer is merely a pretext for discrimination.  *Id.*;

*McDonnell Douglas,* 411 U.S. at 802-803.  To demonstrate a "pretext for discrimination" the

plaintiff must show both that the employer's proffered reason was false, that is, not its true reason,

or that the reason is "unworthy of credence."  *Reeves v. Sanderson Plumbing Products, Inc.*, 530

U.S. 133, 143 (2000); *see also Jackson*, 602 F.3d at 378-79 ("A plaintiff may show pretext 'either

through evidence of disparate treatment or by showing that the employer's proffered explanation is

false or 'unworthy of credence.'").  A plaintiff can avoid summary judgment on a Title VII claim if,

at the third step of the burden shifting analysis, the plaintiff can "substantiate his claim of pretext

through evidence demonstrating that discrimination lay at the heart of the employer's decision."

*Price*, 283 F.3d at 720.

## 2.    Disparate Impact Discrimination

Disparate impact discrimination "addresses employment practices or policies that are facially

neutral in their treatment of these protected groups, but, in fact, have a disproportionately adverse

effect on such a protected group." *Pacheco v. Mineta*, 448 F.3d 783, 787 (5th Cir.), *cert. denied*, 547

U.S. 888 (2006).  "To state a claim of disparate impact, a plaintiff must show '(1) a facially neutral

policy; (2) that, in fact, has a disproportionately adverse effect on a protected class.'"  *Dunn v.*

*Hunting Energy Servs.*, 288 F.Supp.3d 749, 775 (S.D. Tex. 2017) (quoting *Pacheco*, 448 F.3d at

791).  While a plaintiff need not prove discriminatory motive, the defendant can "rebut a *prima facie*

showing of disparate impact by proving that the challenged policy is a business necessity." *Pacheco*,

448 F.3d at 787.

### 3.    Hostile Work Environment Discrimination

For the next class of discrimination claims – those based on a hostile work environment – a plaintiff must prove: (1) membership in a protected class; (2) unwelcome harassment; (3) harassment based on the plaintiff's membership in a protected class; and (4) harassment that affects a term, condition, or privilege of employment. *See Cortes v. Maxus Expl. Co.*, 977 F.2d 195, 199 (5th Cir. 1992); *see also McCray v. DPC Indus., Inc.*, 942 F. Supp. 288, 292 (E.D. Tex. 1996). As with disparate treatment discrimination claims, sex, race, and national origin are all protected classes for purposes of a hostile work environment claim. As for the harassment complained of, it must be both unwelcome, and *based on* the plaintiff's membership in a protected class. *See, e.g.*, *Harris-Childs v. Medco Health Sols., Inc.*, No. 4:03-CV-77-Y, 2005 WL 562720, at *6 (N.D. Tex. Mar. 10, 2005) ("To establish a *prima-facie* case of racial harassment, the plaintiff must provide evidence that the complained-of conduct had a racial character or purpose."), *aff'd*, 2006 WL 616022 (5th Cir. 2006) ("[W]e agree with the district court that Appellant has failed to show that the harassment was racially based."); *Vallecillo v. U.S. Dep't of Housing & Urban Dev.*, 155 F.App'x 764, 767 (5th Cir. 2005) ("Accepting all of the incidents Vallecillo lists as true, none are related to his protected status."); *Smith v. Ridge*, Civil Action No. H-03-5864, 2005 WL 6443884 *4-5 (S.D. Tex. Feb. 8, 2005) (granting summary judgment on hostile work environment age discrimination claim where there was no summary judgment that any harassment "was based on [ ] age"). Finally, the alleged harassment must be sufficiently severe or pervasive such that it can be said to affect a term, condition or privilege of employment. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-23 (1993). Whether the harassment is sufficiently severe or pervasive is based on the totality of the circumstances:

8

> [W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.

*Id.* at 23; *accord Long v. Eastfield Coll.*, 88 F.3d 300, 309 (5th Cir. 1996). The conduct must be both objectively hostile to a reasonable person and the plaintiff must subjectively perceive the environment to be abusive. *Harris*, 510 U.S. at 21-22. The "mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee" does not sufficiently affect a person's employment conditions to fall within the ambit of Title VII. *Rogers v. EEOC*, 454 F.2d 234, 238 (5th Cir. 1971), *cert. denied*, 406 U.S. 957 (1972); *see also Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57 (1986). Moreover, racial comments which are sporadic in nature or made in casual conversation do not violate Title VII. *McCray*, 942 F.Supp. at 293; *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1412 (10th Cir. 1987). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the "'terms and conditions of employment.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 778 (1998). Instead, there must be a "steady barrage of opprobrious racial comment." *McCray*, 942 F.Supp. at 293; *Johnson v. Bunny Bread Co.*, 646 F.2d 1250, 1257 (8th Cir. 1981).

### 4.    Retaliation

For retaliation claims, a plaintiff must first establish a *prima facie* case of retaliation, with proof that: (1) the plaintiff engaged in protected activity; (2) an adverse employment action occurred; and (3) a causal link exists between the protected activity and the adverse employment decision. *Sherrod v. Am. Airlines, Inc.*, 132 F.3d 1112, 1122 & n.8 (5th Cir. 1988). "Protected activity is defined as opposition to any practice rendered unlawful by Title VII, including making a charge,

testifying, assisting, or participating in any investigation, proceeding or hearing under Title VII." *Green v. Adm'rs of the Tulane Educ. Fund*, 284 F.3d 642, 657 (5th Cir. 2002). What constitutes an "adverse employment action" for purposes of a retaliation claim is not the same as what constitutes an adverse employment action for purposes of a disparate treatment claim. In *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006), the United States Supreme Court made it clear that for purposes of the anti-retaliation provisions of Title VII, an adverse employment action is not limited to ultimate employment decisions, but instead encompasses actions taken by an employer that are harmful enough that it "might have dissuaded a reasonable worker from" engaging in protected activity. Thus, what constitutes an adverse employment action for purposes of a retaliation claim is highly dependent upon the context and circumstances at issue. *McCoy v. City of Shreveport*, 492 F.3d 551, 560 (5th Cir. 2007); *see also Monsivais v. Arbitron, Inc.*, 44 F.Supp.3d 702, 707 (S.D. Tex. 2014) (what constitutes an adverse employment action for a retaliation claim is "an objective fact-specific review 'because the significance of any given act of retaliation will often depend upon the particular circumstances. Context matters.'") (quoting *Burlington N.*, 548 U.S. 53, 69)). As for the *prima facie* requirement of a causal link between protected activity and an adverse employment action, the timing of an adverse employment action in relation to when an employee engaged in a protected activity "can be a significant, although not necessarily determinative, factor" in determining whether a causal nexus exists. *See Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1092 (5th Cir. 1995); *see also, e.g.*, *Grizzle v. Travelers Health Network, Inc.*, 14 F.3d 261, 268 (5th Cir. 1994) (finding that a ten month lapse between filing a complaint with a supervisor and an adverse employment action failed to support an inference of retaliation). At the *prima facie* stage, a "but for" causal link need not be shown. *Evans v. City of Houston*, 246 F.3d 344, 354 (5th Cir.

2001).

Once the plaintiff establishes a *prima facie* case of retaliation, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment decision. *Sherrod*, 132 F.3d at 1122. If the defendant carries this burden, the plaintiff must prove that the stated nondiscriminatory reason for the adverse employment action is a "pretext" for discrimination by either "'directly persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered reason is unworthy of credence.'" *Williams v. Louisiana*, 721 F.App'x 380, 381 (5th Cir. 2018) (quoting *Tex. Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)). To carry the ultimate burden on a retaliation claim, a plaintiff must also show that a defendant would not have taken the adverse employment action "but for" the plaintiff's participation in the protected activity. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013) ("Title VII retaliation claims must be proved according to traditional principles of but-for causation, not the lessened causation test stated in § 2000e–2(m). This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.").

### 5. Limitations and Administrative Exhaustion

Title VII claims, whether they are based on allegations of disparate treatment, disparate impact, hostile work environment, or retaliation, are subject to a statute of limitations that is tied to an administrative complaint process. That means that a plaintiff must first file a discrimination charge with the Equal Employment Opportunity Commission (EEOC) within 300 days of an alleged unlawful employment practice. 42 U.S.C. § 2000e-5(e)(1). Upon obtaining a right to sue letter from the EEOC, a plaintiff then has ninety days to file a Title VII claim in district court. *Taylor v. Books*

*A Million, Inc.*, 296 F.3d 376, 379 (5th Cir. 2002).  Alleged unlawful employment acts that occur more than three hundred days prior the filing of an EEOC charge are generally time-barred.  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 (2002) ("a Title VII plaintiff raising claims of discrete discriminatory or retaliatory acts must file his charge within the appropriate time period—180 or 300 days—set forth in 42 U.S.C. § 2000e–5(e)(1).").  Somewhat similarly, complaints of unlawful employment practices that are not included in an EEOC charge cannot generally be raised in federal court.  But, whether a claim has been sufficiently raised in an EEOC charge is a not a straightforward assessment.  While "the scope of an EEOC complaint should be construed liberally," *Pacheco*, 448 F.3d at 788, claims that are not specifically raised in an EEOC charge and could not "reasonably be expected to . . . grow out of [a] charge of discrimination, *Patton v. Jacobs Eng'g Grp., Inc.*, 874 F.3d 437, 444 (5th Cir. 2017), cannot be pursued in federal court due to a failure to exhaust administrative remedies.  *Hernandez v. Metro. Transit Auth. of Harris Cty.*, 673 F. App'x 414, 416 n.1 (5th Cir. 2016) (claims for which a plaintiff has not exhausted his administrative remedies are barred from review in federal court).

   **B.    § 1981**

   The same elements and standard of proof applicable for Title VII claims are applicable to race discrimination claims under 42 U.S.C. § 1981.  *See Jones v. Robinson Prop. Grp., L.P.*, 427 F.3d 987, 992 (5th Cir. 2005)*; Tanik v. S. Methodist Univ.*, 116 F.3d 775 (5th Cir.), *cert. denied*, 522 U.S. 1015 (1997); *Southard v. Tex. Bd. of Criminal Justice*, 114 F.3d 539, 554 (5th Cir. 1997).  The only real difference between race discrimination claims brought under Title VII and race discrimination claims under § 1981 claims, is the administrative exhaustion requirement for Title VII claims, as well as the limitations period for claims under § 1981: § 1981 race discrimination

claims need not be included in an EEOC charge, and only events that occurred within four years of

suit being filed are actionable.  *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 382 (2004).

C.    **Equal Pay Act**

The EPA prohibits an employer from discriminating against its employees on the basis of sex

by paying wages to employees of one sex "in such establishment at a rate less than the rate at which

[the employer] pays wages to employees of the opposite sex" for equal work on jobs that require

"equal skill, effort, and responsibility, and which are performed under similar working conditions

. . . ." 29 U.S.C. § 206(d)(1).  To establish a *prima facie* case under the EPA, a plaintiff must come

forth with evidence: "(1) that her employer is subject to the Act; (2) that she performed work in a

position requiring equal skill, effort and responsibility under similar working conditions; and (3) that

she was paid less than members of the opposite sex."  *Jones v. Flagship Int'l*, 793 F.2d 714, 722–23

(5th Cir. 1986).  "To establish 'equal work', the plaintiff need only prove that the 'skill, effort and

responsibility' required in the performance of the jobs is 'substantially equal.'"  *Id.*  (quoting *Pearce

v. Witchita Cty., City of Witchita Falls, Tex. Hosp. Bd.*, 590 F.2d 128, 133 (5th Cir.1979)).  "The Act

necessarily requires a plaintiff to compare her skill, effort, responsibility and salary with a person

who is or was similarly situated."  *Id.*

Once a *prima facie* Equal Pay Act case has been made, the burden shifts to the employer to

show that the pay differential is justified by one of the EPA's four enumerated exceptions.  The EPA

provides in this regard:

> No employer having employees subject to any provisions of this section shall
> discriminate, within any establishment in which such employees are employed,
> between employees on the basis of sex by paying wages to employees in such
> establishment at a rate less than the rate at which he pays wages to employees of the
> opposite sex in such establishment for equal work on jobs the performance of which

13

requires equal skill, effort, and responsibility, and which are performed under similar working conditions, *except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex.*

29 U.S.C.A. § 206(d)(1) (emphasis added).  If an employer is able to come forth with a "legitimate, non-discriminatory reason for an alleged pay disparity, the plaintiff must then show that the purported reason is a pretext for discrimination." *Browning v. Sw. Research Inst.*, 288 F. App'x 170, 174 (5th Cir. 2008), *cert. denied*, 555 U.S. 1170 (2009).

Claims under the EPA are generally subject to a two year statute of limitations, with the limitations period being extended to three years for willful violations.  29 U.S.C. § 255(a).  There is no administrative exhaustion requirement for EPA claims.  *Stith v. Perot Sys. Corp.*, 122 F. App'x 115, 119 (5th Cir. 2005).

### D.    ADA

The Americans with Disabilities Act ("ADA") prohibits an employer from discriminating "against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a).  A plaintiff asserting a claim under the ADA may either present direct evidence of discrimination based on a disability, or utilize the indirect method of proof outlined in *McDonnell Douglas*.  *Caldwell v. KHOU-TV*, 850 F.3d 237, 241 (5th Cir. 2017).  If proceeding under the indirect method of proof, a plaintiff must establish a *prima facie* case of disability discrimination with evidence that: (1) he or she has a disability, or was regarded as disabled; (2) he or she was qualified for the job; and (3) he or she was subject to an adverse employment decision on account of the disability.  *Id.*  If that *prima facie* showing is made, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action.  *Id.* "The burden then shifts back to the plaintiff to

14

produce evidence from which a jury could conclude that the employer's articulated reason is pretextual." *Id.* This is done with "'evidence of disparate treatment or by showing that the employer's proffered explanation is false or unworthy of credence." *Id.* (quoting *Jackson v. Cal–W. Packaging Corp.*, 602 F.3d 374, 378–79 (5th Cir. 2010)).

As with claims arising under Title VII, ADA claims must be alleged in a charge of discrimination filed within 300 days of the alleged disability discrimination. *Patton v. Jacobs Eng'g Grp., Inc.*, 874 F.3d 437, 443 (5th Cir. 2017). In addition, suit in federal court on an ADA claim must be filed within 90 days of receipt of a right to sue letter. These requirements are prerequisites to suit in federal court. *Id.*; *Garcia v. Penske Logistics, LLC*, 165 F.Supp.3d 542, 552 (S.D. Tex. 2014), *aff'd*, 631 F.App'x 204 (5th Cir. 2015).

## IV.   Discussion – Aguirre

As a preface to her claims and consideration of whether there is a genuine issue of material fact for trial, the uncontested facts related to Aguirre's employment are set forth to provide context. Those uncontested facts reveal that Aguirre was, in 2008, first employed by Valerus Field Solutions L.P. ("Valerus") in the Supply Chain Division as a "Buyer". Her salary was $54,500. Her immediate supervisor at that time was Kyle Survance. In 2010 or 2011, Scott McKinnon became the Vice President of the Supply Chain Division, and Aguirre's direct supervisor.[2] In May 2011,

---

[2] There is no clear evidence as to when Scott McKinnon became Aguirre's supervisor. McKinnon states in his Declaration that he "started as the Vice President-Procurement in early 2010 [and] [i]n that capacity [ ] oversaw the Purchasing Group, which included Aguirre and Momin. Declaration of L. Scott McKinnon at 1 (Document No. 68-1 at 11). Aguirre testified in her deposition that Scott McKinnon became her supervisor in "2010, 2011, somewhere around that time." Aguirre Deposition at 34 (Document No. 68-4 at 10).

15

Aguirre became a Purchasing Supervisor in the Supply Chain Division; her salary increased to $72,000.  In April 2012, Aguirre's salary increased to $73,800.

In early 2013, Aguirre and the three employees she supervised as a Purchasing Supervisor were placed under the supervision of Bryan King, who had become the Director of Supply Chain in 2011.  In 2014, after a corporate acquisition of Valerus by SNC-Lavalin, Inc., the Supply Chain Division at Valerus was headed by King in his position as Director and, including King, had thirteen employees.   In 2014, Aguirre was not selected for a newly created position of "Commodity Outsourcing Manager."   In April 2014, Aguirre resigned from Valerus and started a new job at Alegacy Equipment.  On July 21, 2014, following her resignation, Aguirre filed an EEOC Charge of Discrimination, alleging that:

> On April 21, 2008, I began my employment with Valerus as a Buyer III.  In May 2011, I was promoted to Sourcing Supervisor.  Since being [in] that position I have had management duties assigned to me.  However, my title and pay grade has not been changed.  I have repeatedly complained about my pay discrepancy to no avail. I have also been treated different than others in management, White males.  White males in management and two buyers [ ] had an office [ ] but minority females were not given offices.  Also, I was given the same cell phone allowance as my group, when I should have been given $50 more.  On January 15, 2014, I was asked by Brian King, Director of Supply Chain to acquire the duties of Outsourcing Commodity Manager.  He stated he would discuss my job title and pay grade with HR.  In early February 2014, I was informed by him that they decided to fill the position with someone else.  I asked for the extra duties to be split.  Brian got upset with me for asking and took the extra duties away from me.  I could no longer take the difference in treatment and constructively discharged myself on April 9, 2014.  Later, I was informed the position of Outsourcing Commodity Manager was filled by a White male, [who] was given an office.

EEOC Charge (Document No. 68-7) at 2.[3]  Aguirre obtained a right to sue letter from the EEOC, and

---

[3] Aguirre filed an amended EEOC Charge a year later, which included, by checked boxes, complaints of retaliation, race discrimination and violations of the Equal Pay Act.  None of her written allegations changed.  (Document No. 3-1 at 4).

filed this lawsuit within ninety days thereafter.

Unlike her EEOC charge, in which Aguirre complained about a pay discrepancy and work duties, not being given an office, being short-changed on a cell phone allowance, and not being given a position as a "Outsourcing Commodity Manager," Aguirre has, in an amended Interrogatory response in this case, set forth the following eighteen (18) alleged adverse employment actions, by date and description, upon which she bases her claims of race, national origin and sex discrimination, and retaliation under Title VII and race discrimination under § 1981:

ACTION 1:
2010
Aguirre and other minorities in supply chain not given market value raises based on the TPG salary analysis.

ACTION 2:
2011
Aguirre denied raise after increased workload.

ACTION 3:
2011
Bryan King chose two white males with less experience at Valerus as "product buyers" over Aguirre.

ACTION 4:
2011
King hires white male (Flurett) for "manager" position instead of Aguirre.

ACTION 5:
2011
King advises employees in "Supply Chain" not to help Elizabeth Aguirre's group, which consisted of only minority employees.

ACTION 6:
2011
McKinnon and King deny Aguirre's request for help with workload, even though it's higher than while males' in "supply chain."

ACTION 7:
2011
Locascio and Moore tell Aguirre that King told them not to help Elizabeth Aguirre's group, which consists only of minorities.

ACTION 8:
2011-2014
King tells Aguirre to "convince, conform, or leave," in response to complaints about unequal workload between minorities and white "supply chain" employees.

ACTION 9:
2011
Aguirre and other minorities in supply chain are denied offices even though white employees had offices.

ACTION 10:
2011-2014
King tells Aguirre that her group is "just tactical."  This group consists exclusively of minorities at the time.

ACTION 11:
2012
McKinnon denies Aguirre "product line manager" position.

ACTION 12:
2012
Aguirre denied cell phone allowance even though white males received one.

ACTION 13:
2013
King denies request for raise even though [Aguirre] is given additional workload.

ACTION 14:
2013
King promotes a white male (McClenathen) to position of "strategic sourcing manager" over Aguirre even though she has four more years of experience than him.

ACTION 15:
2013
King threatens to demote Aguirre when she requests a raise and complains of unequal treatment.  King also threatens to place her on a "developmental plan."

ACTION 16:
2014
King hires a less experienced white male (Land) to position of "commodity manager"
over Aguirre.

ACTION 17:
2014
After Aguirre speaks with Human Resources Manager Jenny Dang about unequal
salaries, Ms. Dang advises Aguirre to "look for employment outside of Valerus."

ACTION 18:
2014
Aguirre is forced to resign.

Aguirre Amended Interrogatory Responses (Document No. 68-8 at 17-24). Because, as argued by

Defendants, many of these complaints occurred more than 300 days before Aguirre filed a EEOC

Charge (September 23, 2013) and because others were not included in that EEOC charge, those

claims are not actionable under Title VII. Aguirre does not concede as much in her Response to the

Motion for Summary Judgment, but basically ignores the issue and only attempts to resurrect it in

her Sur-Reply, arguing, "[i]f Plaintiff has claimed a hostile work environment existed, the alleged

time barred actions may well be taken into consideration for the Court." Aguirre Sur-Reply

(Document No. 87) at 3.

"The United States Supreme Court has made clear that the continuing violation doctrine does

not apply to discrimination and/or retaliation claims," but may apply to hostile work environment

claims. *Skaggs v. Van Alstyne Indep. Sch. Dist.*, No. 4:16-CV-00227-CAN, 2017 WL 77825, at *6

(E.D. Tex. Jan. 9, 2017); *Stewart v. Miss. Transp. Comm'n*, 586 F.3d 321, 328 (5th Cir. 2009)

("Unlike in a case alleging discrete violations, a hostile environment plaintiff is not limited to filing

suit on events that fall within this statutory time period because her claim is comprised of a series

of separate acts that collectively constitute one 'unlawful employment practice.'") (quoting *Nat'l*

*R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002)).  That means that only complaints supporting a hostile work environment claim can withstand a statute of limitations defense under a continuing violation theory.  *Heath v. Bd. of Supervisors for S. Univ. & Agric. & Mech. Coll.*, 850 F.3d 731, 737 (5th Cir. 2017), *as revised* (Mar. 13, 2017) ("Claims alleging discrete acts are not subject to the continuing violation doctrine; hostile workplace claims are.").  But, here, Aguirre does nothing to advance a continuing violation argument to counter Defendants' limitations defense or support her own hostile work environment claim.  Instead, she argues that she has alleged a hostile work environment claim, and that that should be enough.

The summary judgment evidence in the record does not support a *prima facie* hostile work environment claim.  The comments and conduct about which Aguirre complains – being referred to or called a "minion," "the help," or "just tactical," being given an overload of job duties, denying her a full cell phone allowance, denying her requests for assistance and additional compensation, and making empty promises of promotions – all over the course of her six years of employment with Valerus – do not constitute severe or pervasive harassment as a matter of law.  First, the comments about which Aguirre complains, in addition to not having any overt or inferential racial, gender-based, or national origin overtones, do not fall within the type of comments that are considered "severe" for a hostile work environment claim.  *See e.g., Cicalese v. Univ. Tex. Med. Branch*, Civil Action No. 3:17-cv-67, 2018 WL 1427174 at *8 ("three vague statements about Italy and Italians" could not be considered severe harassment for purposes of a hostile work environment claim); *see also Higgins v. Lufkin Indus., Inc.*, 633 F.App'x 229, 235 (5th Cir. 2015) ("Isolated incidents do not support a hostile work environment claim unless the complained-of incident is 'extremely serious' in nature.").  Second, the comments have not been shown, with competent summary judgment

evidence, to have been pervasive in the work place, meaning that there was a "steady barrage" of such comments.  *Torrez v. Milk Prods., L.P.*, 402 F.Supp.2d 773, 779 (W.D. Tex. 2005).  While Aguirre maintains that she considered the comments degrading, there is no summary judgment evidence in the record about how often such comments were made and no summary judgment evidence, only Aguirre's speculative belief, that the comments had anything to do with her race, national origin or sex.  The summary judgment evidence does not support a hostile work environment claim under Title VII, and Defendants are entitled to summary judgment on that claim.  In addition, because the viability of a hostile work environment claim is the only way Aguirre could overcome the Valerus' limitations defense and because Aguirre's complaints about conduct  that occurred more than 300 days before she filed her EEOC charge can and should be considered discrete acts, Defendants are also entitled to summary judgment, on their statute of limitation defense, on all of Aguirre's Title VII disparate treatment complaints based on conduct that occurred before September 23, 2013, as well as all of Aguirre's § 1981 race discrimination claims based on conduct that occurred before December 23, 2011.

A.      **Title VII Claims**

With the statute of limitations barring consideration of any alleged adverse employment actions that occurred before September 23, 2013, only the following alleged adverse employment actions warrant any consideration on the merits under Title VII:

ACTION 8:
2011-2014
King tells Aguirre to "convince, conform, or leave," in response to complaints about unequal workload between minorities and white "supply chain" employees.

ACTION 10:
2011-2014
King tells Aguirre that her group is "just tactical."  This group consists exclusively
of minorities at the time.

ACTION 13:
2013
King denies request for raise even though [Aguirre] is given additional workload.

ACTION 14:
2013
King promotes a white male (McClenathen) to position of "strategic sourcing
manager" over Aguirre even though she has four more years of experience than him.

ACTION 15:
2013
King threatens to demote Aguirre when she requests a raise and complains of unequal
treatment.  King also threatens to place her on a "developmental plan."

ACTION 16:
2014
King hires a less experienced white male (Land) to position of "commodity manager"
over Aguirre.

ACTION 17:
2014
After Aguirre speaks with Human Resources Manager Jenny Dang about unequal
salaries, Ms. Dang advises Aguirre to "look for employment outside of Valerus."

ACTION 18:
2014
Aguirre is forced to resign.

     **1.**     **Disparate Treatment**

Of the adverse employment actions that are not time-barred, several do not constitute adverse

employment actions as a matter of law, and another cannot support a *prima facie* case of

discrimination.  The conduct complained of in "Action 8" ("King tells Aguirre to 'convince,

conform, or leave,' in response to complaints about unequal workload between minorities and white

'supply chain' employees."), "Action 10" ("King tells Aguirre that her group is 'just tactical.'  This group consists exclusively of minorities at the time."), and "Action 17" ("After Aguirre speaks with Human Resources Manager Jenny Dang about unequal salaries, Ms. Dang advises Aguirre to 'look for employment outside of Valerus.'") do not constitute adverse employment actions as a matter of law because they were not ultimate employment decisions.  *See Lopez v. Kempthorne*, 684 F. Supp. 2d 827, 885–86 (S.D. Tex. 2010) (discussing what actions are not adverse employment actions for purposes of a disparate treatment claim).  Nor does "Action 15," which is based on threats of a demotion and/or being placed on an improvement/developmental plan, constitute an adverse employment action as a matter of law.  *Breaux v. City of Garland*, 205 F.3d 150, 158 (5th Cir.), *cert. denied*, 531 U.S. 816 (2000); *Walker v. Thompson*, 214 F.3d 615, 629 (5th Cir. 2000), *abrogated on other grounds, Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006).  As for "Action 13," Aguirre has not established a *prima facie* case of race, national origin or sex discrimination.  While Aguirre testified at her deposition that she asked for a raise when additional work responsibilities were placed on her, she has come forth with no summary judgment evidence that anyone outside her protected classes (Hispanic, Mexican, and female) were treated more favorably than she in terms of a requested raise for additional work.

This leaves three employment actions, Action 14, Action 16, and Action 18, to be addressed, each of which, as alleged, is a cognizable adverse employment action.  But Action 18 fails because the summary judgment evidence does not raise a genuine issue of material fact for trial on whether Aguirre was constructively discharged, and Action 14 and Action 16 fail because Aguirre has come forth with no summary judgment evidence that raises a genuine issue of material fact on pretext.  In addition, to the extent Aguirre tries to expand her claims about her cellphone allowance to conduct

23

that occurred in 2013, within the limitations period, and assert a new claim based on a change in her

job title from supervisor to Buyer III in 2013, neither claim has been shown by Aguirre, *with

summary judgment evidence*, to constitute an adverse employment action.

As set forth above, an adverse employment action for purposes of a Title VII disparate

treatment claim is an ultimate employment decision, "such as hiring, firing, demoting, promoting,

granting leave, and compensating." *Thompson v. City of Waco, Tex.*, 764 F.3d 500, 503 (5th Cir.

2014), *reh'g en banc denied*, 779 F.3d 343 (5th Cir. 2015). "[A]n employment action that 'does not

affect job duties, compensation, or benefits' is not an adverse employment action." *Id.* (quoting

*Pegram v. Honeywell, Inc.*, 361 F.3d 272, 282 (5th Cir. 2004)). Aguirre's complaints about how

much she was given in a cellphone allowance – $50 less than was allowed for those she considered

her comparators – while having some bearing on her overall compensation, does not fit within the

types of conduct that could be considered an ultimate employment action. *See e.g., Wojciechowski

v. Nat'l Oilwell Varco, L.P.*, 763 F. Supp. 2d 832, 856 (S.D. Tex. 2011) (denial of use of company

credit card was an adverse employment action). Moreover, the summary judgment evidence shows

that Aguirre *was* given a cellphone allowance when she asked for one, *see* King Deposition at 104-

106 (Document No. 68-3 at 27-28); Aguirre Deposition at 227 (Document No. 68-4 at 58), and

nothing in the record shows that anyone similarly situated to Aguirre receiver a greater cellphone

allowance than she. With regard to Aguirre's complaints about the change in her job title in 2013,

from sourcing supervisor to Buyer III, because Aguirre didn't even know that her position had been

reclassified, Aguirre Deposition at 130-133 (Document No. 68-4 at 34-35), and because that title

change was not accompanied by any change in compensation or job duties, *see* King Deposition

(Document No. 68-3 at 23), it does not constitute an adverse employment action. *Thompson*, 764

24

F.3d at 503 (a change in job title or a transfer that does not result in a *decrease* "in pay, title, or grade' and is not an objectively worse position, is not an adverse employment action.).[4]  Aguirre's subjective beliefs to the contrary, which is all she has offered, do not create a genuine issue of material fact for trial.  *Vicknair v. La. Dept. of Pub. Safety and  Corr.*, 555 F. App'x 325, 331 (5th Cir. 2014) ("In the context of summary judgment, 'plaintiff's subjective belief, without more, that an adverse employment action was retaliatory is insufficient to survive summary judgment'"); *Kennerson v. Guidry*, 135 F. App'x 639, 641 (5th Cir. 2005) (subjective belief of discrimination and/or retaliation is insufficient to raise a genuine issue of material fact); *Cephus v. Tex.Health and Human Servs. Comm'n*, Civ. A. H-14-696, 2015 WL 7313414 *14 (S.D. Tex. Nov. 19, 2015) (subjective belief of retaliation is insufficient).

As for Aguirre's failure to promote claims, Aguirre maintains that on two occasions, in 2013 and 2014, she was passed over for promotions in favor of white males (Action 14 and Action 16). According to Aguirre, in 2013, Richard McClenathen was promoted, over her, to the position of "strategic sourcing manager," and in 2014, Adam Land was given the position of "commodity manager" over her.  Aguirre has, with these two failure to promote claims, ostensibly established a *prima facie* case of disparate treatment discrimination, with evidence that: (1) she was not promoted

---

[4] There is some dispute in the summary judgment evidence about Aguirre's "Buyer" title. Aguirre testified at her deposition that she was hired as a Buyer III, and that she was always a Buyer III.  Aguirre Deposition at 32, 42 (Document No. 68-4 at 9, 11).  But the summary judgment evidence shows that her original job offer was for a "Buyer" position (Document No. 68-2), and King testified at his deposition that there were Buyer I and Buyer II positions, and they later added a Buyer III position, which is what he characterized Aguirre as in April 2013.  King Deposition at 52-52, 120 (Document No. 68-3 at 14-15, 31).   This dispute in the evidence about Aguirre's job title does not raise a genuine issue of material fact for trial.  That is because the change in Aguirre's title in 2013, from sourcing supervisor to Buyer III, was not accompanied by any change in compensation, benefits, or job duties.  King Deposition at 85-86 (Document No. 68-3 at 23).

to strategic sourcing manager or commodity manager; (2) she was arguably qualified for both positions; (3) she was a member of a protected class at the time she was not promoted (Hispanic, Mexican, female); and (4) Valerus promoted persons outside of Aguirre's protected classes to the positions. *Autry v. Fort Bend Indep. Sch. Dist.*, 704 F.3d 344, 346–47 (5th Cir. 2013) (a *prima facie* failure to promote case requires proof that the plaintiff: (1) was not promoted, (2) the plaintiff was qualified for the position sought, (3) the plaintiff fell within a protected class at the time of the failure to promote, and (4) the defendant either gave the promotion to someone outside of that protected class or otherwise failed to promote the plaintiff because of the plaintiff's race).  In response to this *prima facie* case of discrimination, Valerus has articulated legitimate, non-discriminatory reasons for both employment decisions.  With respect to Richard McClenathen, Valerus states that he was initially hired, in May 2012, as a Buyer and given a salary of $65,000.  *See* Offer Letter dated May 15, 2012 (Document No. 77-6).  He was promoted to the position of "Strategic Sourcing Manager I" on April 6, 2014 (not in 2013 as alleged by Aguirre), just days before Aguirre submitted her resignation.  According to King, and not refuted by any controverting evidence, Aguirre had not expressed an interest in a strategic sourcing manager position, and did not apply for the position.  King Deposition at 83 (Document No. 68-3 at 22).  Instead, at the time McClenathen was given the position, Aguirre had already interviewed and secured a position at another company.  Aguirre Deposition at 256-57 (Document No. 68-4 at 65-66).   As for Adam Land, King testified at his deposition that he chose Land for the position over Aguirre because he had manufacturing experience and because he was losing his job at a Valerus plant that was closing.  King Deposition

26

at 80-82 (Document No. 68-3 at 21-22).[5]  Those explanations fulfill Valerus' burden of articulating legitimate, non-discriminatory reasons for the employment decisions about which Aguirre complains.  *Alvarado v. Texas Rangers*, 492 F.3d 605, 611 (5th Cir. 2007) ("The burden on the employer at this stage "is one of production, not persuasion; it 'can involve no credibility assessment.'").  The burden then shifts back to Aguirre to come forth with evidence of pretext.  To do so on a failure to promote claim, Aguirre must come forth with summary judgment evidence that "she was 'clearly better qualified' (as opposed to merely better or as qualified) than the chosen employee."  *Roberson-King v. La. Workforce Comm'n, Office of Workforce Dev.*, 904 F.3d 377, 381 (5th Cir. 2018) (quoting *EEOC v. La. Office of Cmty. Servs.*, 47 F.3d 1438, 1444 (5th Cir. 1995)).  This entails presenting evidence that "no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question."  *Deines v. Tex. Dep't of Protective & Regulatory Servs.*, 164 F.3d 277, 280–81 (5th Cir. 1999).  Aguirre could also establish a genuine issue of material fact on pretext with evidence that "the employer's proffered explanation is false or 'unworthy of credence.'"  *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 220 (5th Cir. 2001).

---

[5] When asked at his deposition why Aguirre did not get the position of Commodity Outsourcing Manager, King responded:

> At that time we had one of our plants that was shutting down.  Adam Land had manufacturing experience, whereas Liz did not have manufacturing experience.  I had to choose in-between Adam Land, who was an employee that would have lost his position with the company because the plant was shutting down, and I also had to balance that with who had more manufacturing experience, and specifically for outsourcing, it was a valued experience that Liz Aguirre simply didn't have and Adam Land did.

King Deposition at 80 (Document No. 68-3 at 21).

Here, Aguirre does not point to summary judgment evidence that raises a genuine issue of material fact on pretext.  First, Aguirre has come forth with no evidence that she expressed an interest in, or applied for, the position Richard McClenathen got.  Instead, the summary judgment evidence indicates that Aguirre was planning on resigning and had already secured another job.  As for Adam Land, there is no summary judgment evidence that Aguirre was "clearly better qualified" than he, or that Valerus' explanation for choosing Land over her is false or unworthy or credence. Although Aguirre argues that no manufacturing experience was needed for the commodity manager position, she points to no summary judgment evidence that would show that Land's manufacturing experience made him a less qualified candidate than her, or that her race, national origin, or sex had any bearing on the decision to promote Land over her.   Instead, all Aguirre does is rely on her own subjective beliefs that her ill treatment and the treatment of those in her group, which was made up of mostly minorities, can only be explained as being based on race, national origin and sex discrimination.  This is not sufficient to raise a genuine issue of material fact for trial on pretext.  *De La Cruz v. Coastal Bend Reg'l Court Residential Treatment Ctr.*, 978 F. Supp. 2d 751, 757 (S.D. Tex. 2013); *Ceasar v. N. Star Steel Tex., Inc.* 69 F.Supp.2d 858, 866 (E.D. Tex.1999).  Valerus is, accordingly, entitled to summary judgment on Aguirre's failure to promote claims (Action 14 and Action 16).

That leaves Aguirre's claim of constructive discharge (Action 18).  A constructive discharge can constitute an adverse employment action, *Odeh v. City of Baton Rouge/Par. of E. Baton Rouge*, 731 F.App'x 288, 292 (5th Cir. 2018), but to qualify as a constructive discharge that would satisfy the "adverse employment" element of a *prima facie* case of disparate treatment discrimination, there must be evidence that a "'reasonable employee would feel compelled to resign' under the

circumstances." *Noack v. YMCA of the Greater Houston Area*, 418 F. App'x 347, 352 (5th Cir.) (quoting *Stover v. Hattiesburg Pub. Sch. Dist.*, 549 F.3d 985, 991 (5th Cir. 2008)), *cert. denied*, 565 U.S. 953 (2011).   This requires a "greater degree of harassment than that required by a hostile environment claim." *Brown v. Kinney Shoe Corp.*, 237 F.3d 556, 566 (5th Cir.),  *cert. denied*, 534 U.S. 817 (2001).   Factors relevant to a constructive discharge determination include, whether the employee has suffered a: "(1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (6) offers of early retirement that would make the employee worse off whether the offer was accepted or not."  *Hunt v. Rapides Healthcare Sys.*, LLC, 277 F.3d 757, 771–72 (5th Cir. 2001) (*abrogated on other grounds in Wheat v. Fla. Par. Juvenile Justice Comm'n*, 811 F.3d 702, 717 n.1 (5th Cir. 2016)); *see also Odeh*, 731 F.App'x at 292("In assessing those working conditions, our court considers whether the plaintiff was demoted, paid less, reassigned to menial or degrading work, subject to employer harassment or humiliation that was calculated to encourage the resignation, or asked to resign.").

Aguirre maintains that she felt forced to resign due to the discrimination and retaliation she claims to have suffered.  But Aguirre testified at her deposition that she started looking for another job when she felt like she had no chance of advancement at Valerus and resigned after she found another job.  Aguirre Deposition at 121 (Document No. 68-4 at 32).  In addition, throughout her deposition Aguirre makes it clear that her main complaints were her workload as compared with others in the Supply Chain Group, and her compensation for what she considered were onerous additional job duties that were placed on her.   Those type of complaints, because they cannot support a hostile work environment claim, are insufficient to support a constructive discharge claim.

*See e.g., Johnson v. PRIDE Indus., Inc.*, No. EP-18-CV-00044-FM, 2018 WL 6624691, at *7 (W.D. Tex. Dec. 18, 2018) (where "Plaintiff failed to demonstrate a prima facie case of hostile work environment [ ] he failed to show that he experienced sufficiently pervasive or severe harassment; he was therefore not subjected to a constructive discharge"); *see also Burrle v. Plaquemines Par. Gov't*, 553 F. App'x 392, 395 (5th Cir. 2014) (where there was insufficient evidence to support a hostile work environment claim, there was also insufficient evidence to support a constructive discharge claim).  Defendant Valerus is, accordingly, entitled to summary judgment on Aguirre's constructive discharge claim.

In all, for the reasons set out above, Aguirre has not raised a genuine issue of material fact for trial on her Title VII disparate treatment race, national origin and sex discrimination claims. Summary judgment on those claims is warranted.

### 2.     Disparate Impact

In her Amended Complaint, Aguirre alleges that "Valerus has a policy of paying male employees more than female employees and giving male employees additional employment benefits which it does not provide to its female employees" and that those action "have had a disproportionate impact on its female employees and resulted in prohibited discrimination." (Document No. 3 at 20). Valerus argues in its Motion for Summary Judgment that Aguirre did not exhaust her administrative remedies for this claim and that there is no summary judgment evidence to support Aguirre's disparate impact claim, particularly given Aguirre's admission that "there was no neutral employment practice or policy at Valerus that was responsible for causing a disparate impact on female employees."  Motion for Summary Judgment (Document No. 68) at 52.

In response to Defendants' Motion for Summary Judgment, Aguirre does not respond, at all, to Defendants' argument for summary judgment on the disparate impact claim.  That failure to respond constitutes an abandonment and/or waiver of the claim, *see Keenan v. Tejeda*, 290 F.3d 252, 262 (5th Cir. 2002) (a claim or issue raised in a pleading but ignored on summary judgment may be considered waived and/or abandoned), *Black v. N. Panola Sch. Dist.*, 461 F.3d 584, 588 n.1 (5th Cir. 2006) ("failure to pursue [a] claim beyond her complaint constituted abandonment"), and justifies summary judgment for Valerus on the disparate impact claim.  *See e.g,, Holmes v. N. Texas Health Care Laundry Coop. Ass'n*, 304 F. Supp. 3d 525, 540–41 (N.D. Tex. 2018) (where plaintiff failed to pursue her Title VII retaliation claim and her state law claims when responding to defendant's motion for summary judgment, those claims considered abandoned or waived and summary judgment for defendant on those claims was warranted).

### 3.     Hostile Work Environment

A review of Aguirre's complaints of harassment in connection with the summary judgment evidence in that regard does not raise a genuine issue of material fact for trial on Aguirre's hostile work environment claim.  While there is evidence in the record that Aguirre and those in her group were referred to as "minions," the "hired help" and "just tactical," there is, as set forth above, no summary judgment evidence that the comments were severe or pervasive, and no summary judgment evidence that the comments were based or, or a derogatory reference to, Aguirre's race, national origin or sex.  Valerus is therefore entitled to summary judgment on Aguirre's hostile work environment claim(s).

31

####      4.       Retaliation

Based on her Amended Interrogatory responses and her identification therein of alleged

retaliatory adverse employment actions that fall within the limitations period, there are five bases

for Aguirre's retaliation claim:

> ACTION 8:
> 2011-2014
> King tells Aguirre to "convince, conform, or leave," in response to complaints about
> unequal workload between minorities and white "supply chain" employees.
>
> ACTION 14:
> 2013
> King promotes a white male (McClenathen) to position of "strategic sourcing
> manager" over Aguirre even though she has four more years of experience than him.
>
> ACTION 16:
> 2014
> King hires a less experienced white male (Land) to position of "commodity manager"
> over Aguirre.
>
> ACTION 17:
> 2014
> After Aguirre speaks with Human Resources Manager Jenny Dang about unequal
> salaries, Ms. Dang advises Aguirre to "look for employment outside of Valerus."
>
> ACTION 18:
> 2014
> Aguirre is forced to resign.

Valerus argues in its Motion for Summary Judgment that even if any of these alleged acts of

retaliation can be construed as satisfying the "adverse employment action" element of a *prima facie*

case of retaliation, Aguirre has not come forth with any summary judgment evidence to support two

other elements of her *prima facie* case: that she engaged in protected activity, and that there is a

causal link between the protected activity and the adverse employment decision.  As argued by

Valerus, the record is devoid of summary judgment evidence that Aguirre engaged in protected

activity and devoid of evidence of a causal link between any protected activity and the alleged adverse employment actions.

In response to Defendants' Motion for Summary Judgment, Aguirre maintains that she engaged in protected activity when she complained to Human Resources about disparate treatment. She also maintains that her complaints to HR resulted in increases in her group's workload, denials of assistance for her group, and disregard for her additional compensation requests. While these are Aguirre's *arguments* against summary judgment on her retaliation claims, the summary judgment evidence in the record does not align with those arguments. Instead, the summary judgment evidence reveals that while Aguirre did make complaints to Human Resources about her pay, there is no summary judgment evidence that any complaint was made by her that any unfair treatment was based on her race, national origin or gender. Aguirre admitted during her deposition that she could not recall whether she ever complained to HR, or even suggested, that the pay and work load differentials she brought to HR's attention were based on her race, national origin or sex. Aguirre Deposition at 326-29 (Document No. 68-4 at 83-84). In addition, Jenny Deng, the HR specialist who fielded Aguirre's complaint(s), testified that Aguirre's complaints were about her pay, and did not include any reference to her race, national origin or gender. Deng Deposition at 35-37 (Document No. 68-9 at 10-11). The summary judgment evidence in the record does not raise a genuine issue of material fact on whether Aguirre engaged in protected activity.

In addition, even if Aguirre had shown, or could show, that she engaged in protected activity, the summary judgment evidence also does not raise a genuine issue of material fact on whether there is a causal connection between any protected activity and an adverse employment action. For purposes of a retaliation claim, an adverse employment action is any action taken by an employer

33

that is harmful enough that it "might have dissuaded a reasonable worker from" engaging in protected activity. *Burlington N*, 548 U.S. at 68. Aguirre testified at her deposition that the adverse employment actions she suffered included detrimental changes to her job title, additional work responsibilities, being given a small cubicle, being short-changed on her cellphone allowance, and being threatened with demotion. Aguirre's deposition testimony, however, does not tie any of her complaints to HR to any of these alleged adverse employment actions. Nor is there any summary judgment evidence that ties any protected complaints Aguirre made to HR to any additional job duties, threats of demotion or being placed on a performance improvement plan, the amount of her cellphone allowance, or the size of her cubicle. Given the absence of even any temporal proximity between what Aguirre characterizes as protected activity and what she characterizes as an adverse employment action, she has not established a *prima facie* case of retaliation. Defendant Valerus is, accordingly, entitled to summary judgment on Aguirre's retaliation claim(s).

## B.    § 1981 Claims

Aguirre's race discrimination claims under § 1981 are the same claims asserted by Aguirre under Title VII, and while there is a four year statute of limitations for claims under § 1981, the same claims that are time-barred under Title VII are time-barred under § 1981. This case was filed on December 23, 2015, which means that § 1981 claims based on conduct before December 23, 2011, are time-barred. The conduct alleged in Action 1 though Action 7, and Action 9 all preceded December 23, 2011, and , as such, are barred by § 1981's four year limitations period.

The remaining claims fail for the same reasons set forth above in connection with Aguirre's Title VII claims. Action 8, Action 10, Action 15, Action 17 all fail to state an adverse employment action. Action 13 has no *prima facie* case. Action 14 and 16 fail for lack of summary judgment

34

evidence on pretext. Action 18 fails because the summary judgment evidence does not support a constructive discharge claim. So, for the same reasons set forth above in connection with Aguirre's Title VII race, national origin and sex discrimination claims, Defendant Valerus is entitled to summary judgment on Aguirre's race discrimination claims under § 1981.

C.      EPA Claims

Defendants argue in their Motion for Summary Judgment that Aguirre has not established a *prima facie* case under the Equal Pay Act, and that each of the persons she identified in her Interrogatory responses as comparators for her Equal Pay Act claim held "different positions that required different skills, efforts, and responsibilities under different working conditions." Motion (Document No. 68) at 45. In response to Defendants' Motion for Summary Judgment on this claim, Aguirre only advances Richard McClenathen as a comparator for purposes of her Equal Pay Act claim. Response (Document No. 77) at 19.

Assuming, without deciding, that Richard McClenathen is a valid comparator, the summary judgment evidence in the record is that he was paid the same, if not less, than Aguirre. McKinnon states in his Declaration that as of April 2012, Aguirre was being paid $73,800. (Document No. 68-1 at 12). One month later, when Richard McClenathen was hired, he was paid $65,000. (77-6) His salary did not increase to $75,000 until April – in and around the time Aguirre resigned (Document 77-9). Because Aguirre has not come forth with any evidence that McClenathen was paid more than she was for the same work, she has not established a *prima facie* case under the Equal Pay Act, and Defendants Valerus, McKinnon and King are entitled to summary judgment on that claim. They are also, for the reasons articulated above, entitled to summary judgment on any claim by Aguirre for retaliation under the EPA.

35

In all, having considered the multitude of complaints Aguirre has raised, alongside the summary judgment evidence, the Magistrate Judge concludes that Aguirre has not raised a genuine issue of material fact for trial on any of her claims, and that Valerus is, consequently, entitled to summary judgment on all of her claims.

## V.      Discussion – Onyeri

The uncontested facts related to Kassirim ("Stella") Onyeri's employment are that she was hired as a "Estimator" in May 2011, at an annual salary of $91,500.  In September 2011, she was promoted to the position of "Master Scheduler," with an increased annual salary of $96,075.  In March 3102, her salary increased again to $98,575.  In April 2014, Onyeri was transferred to the Supply Chain Division, under the direction of Defendant King, as a Strategic Sourcing Manager. Her annual salary in that position was $110,000.

On July 21, 2014, while still employed at Valerus, Onyeri filed an EEOC Charge of Discrimination.  On September 23, 2014, she was placed on a Performance Improvement Plan ("PIP"), and on November 12, 2014, a Disciplinary Action report was issued that instructed Onyeri to "refrain from being retaliatory against any Valerus employee" (Document No. 69-6). Approximately two weeks later, on November 27, 2014, Onyeri was approved for short term disability leave.  Over six months later, when she did not return from disability leave, or otherwise make arrangements for additional leave, Onyeri's employment was terminated.   Her position of Strategic Sourcing Manager at the time of her termination was not filled.

Like Aguirre, but to an even greater degree, Onyeri has set forth a litany of alleged adverse employment actions attendant to her discrimination and retaliation claims.  Like Aguirre, some of

those alleged adverse employment actions are untimely, and many of those alleged adverse employment actions do not, and cannot, constitute adverse employment actions for purposes of either a Title VII disparate treatment claim or a Title VII retaliation claim.  Moreover, and quite importantly, Onyeri has not responded to much of Defendants' Motion for Summary Judgment. Because Onyeri's failure to respond to aspects of Defendants' Motion for Summary Judgment constitutes an abandonment of the claims and issues she has not addressed, those claims will be identified  first.

In an amended Interrogatory response, Onyeri identified, by date and description, the following thirty-two (32) alleged adverse employment actions upon which she bases her claims of race, national origin and sex discrimination, and retaliation under Title VII and race discrimination under § 1981:

ACTION 1:
2011
My title of "Manager of Production Equipment Scheduling" was downgraded to "Master Scheduler" without my knowledge, even though I continued doing the same duties and tasks.

ACTION 2:
March 2012
White female who performed duties as a shop scheduler was given same title as me at the Corporate level of "Master Scheduler" but received a lesser workload and was often combative when I asked her to assist with assignments and projects.  I spoke to Jackson [supervisor] about the unfair treatment, but the problem was not addressed.

ACTION 3:
2011 and 2014
I did not receive annual merit increases, even though others did.

ACTION 4:
Between 2011-2014
I was given heavier workloads than other non-minority, similarly situated employees around me.

ACTION 5:
Between 2011-2014
I had a double cubicle as an office space, while my white non remote corporate Supply Chain counterparts were given their own offices at corporate.

ACTION 6:
2014
I was told to force my direct employee to complete a task originally performed incorrectly by white counterparts.  The task requested to complete was what the defendants had previously demoted a Hispanic minority for.  When I reported the preferential treatment toward white counterparts and my direct report concerns, the defendant's response was "I can live with that."  Later I was labeled a bad manager for reporting the preferential treatment and concerns of my team and not forcing my direct report to complete the task.

ACTION 7:
First Quarter of 2012
There was a company-wide merit increase that I was told I should have received, but did not.  My transfer increase was initially passed off as a yearly merit increase, but that was unsuccessful.  I was told I would get the increase later in the year, but I did not, which caused lesser bonus payouts for 2013, 2014, and 2015.

ACTION 8:
September 25, 2012
I received an escalated call from VP Steve Gill regarding a report that was inaccurately provided to Scott [ ] Gill.  Mr. Gill was told that it was my report and that Jackson who created the report, indicated to Steve Gill that it was my responsibility, despite me telling James that the report was inaccurate and should not [ ] be released.

ACTION 9:
March 2013
I did not receive the complete company-wide merit increase percentage as my counterparts.  It was a partial 2.6% instead of 3%.

ACTION 10:
During 2013
I was approached several times to accept an offer for a position of "Buyer" under King in a division of the company that was going to be shut down in an attempt to get rid of me.

ACTION 11:
During 2013
I was told by Jackson that my current "Master Scheduler" position was "going away" and that I needed to search for another job within Valerus immediately, which I later learned was not true.

ACTION 12:
During 2014
I was humiliated and downgraded to a single cubicle by the bathroom in retaliation for speaking to human resources about the unequal treatment and harassment.

ACTION 13:
March 2014
I was paid under the Corporate Incentive Plan (CIP) bonus structure instead of the Manager Incentive Plan (MIP) bonus structure as detailed in my original offer letter. The bonus was provided in a lump sum, with no break down.

ACTION 14:
December 2013 to January 2014
I was offered, then denied the opportunity to be a "project manager" in the Integrated and Major Project division in retaliation of me filing an EEOC complaint in the past while working for another employer.

ACTION 15:
2014
More work was delegated to myself with no assistance, meanwhile, my white counterparts would be provided assistance on several occasions.

ACTION 16:
April 2014
I was forced into a Supply Chain position with a lower pay grade than an Engineering Project Manager position or else face termination because I was told my "Master Scheduler" position was being terminated. Meanwhile, a white female was given my position along with two assistants, which I repeatedly asked for but never received.

ACTION 17:

April 8, 2014

When I asked for respective compensation and title recognition for the Strategic Sourcing Manager position due to my experience and being senior to my male counterparts, I was denied a higher title classification of II or III and was given a non-negotiable small increase.

ACTION 18:

In 2014

Human Resources refused to retroactively pay me for missed merit increases and to adjust new Strategic Sourcing position to reflect the correct percentage increase.

ACTION 19:

During 2014

It was revealed that my pay grade had been lowered from Engineering when I was forced into the Supply Chain position. This was used as an excuse for me not receiving full merit increases and was also the cause of lower bonus payouts based on a formula of years of employment with Valerus.

ACTION 20:

During 2014

I was not offered the "Commodity Manager Position", or the "Corporate Materials Manager" position. Those positions were given to white male employees instead.

ACTION 21:

In 2014

I was reprimanded for working remotely unlike white male counterparts.

ACTION 22:

In 2014

I was put on a Performance Improvement Plan allegedly because of complaints about my performance issues, but truly this action was in retaliation for a series of complaints about the unfair treatment, and the filing of a charge with the EEOC, and complaints to human resources. This ruined [my] employee record despite prior documented exceptional performance records.

ACTION 23:

July 3, 2014

My vacation request for period 7/17 to 8/14 (13 days) is denied, even though there were sufficient hours to cover the request.

ACTION 24:

In 2014

I was told that I was not allowed to park in the building while handicapped because I didn't have the authorized pay grade, which was a grade 22.

ACTION 25:

Sometime in November 2014

I was subjected to multiple meetings in relation to my performance improvement plan, even though there were no complaints about my work product.

ACTION 26:

In 4th quarter of 2014

I am given a Disciplinary Action form, w[hich] contains false complaints with no investigation or personal statement of the events that occurred.

ACTION 27:

Between 2013 and 2014

Several lies and attempts to damage my reputation persisted with falsified statements from Project Managers and Engineers, including lies told to vendors outside the company about my performance, which could hinder future employment. After filing an EEOC claim, the defendants told an outside vendor that they would try to force me to quit.

ACTION 28:

During 2014

Human Resources made several payroll errors, then ignored and delayed my requests to correct the problems.

ACTION 29:

During 2015

My employment with Valerus was terminated while I was on disability.  I lost benefits due to retaliatory firing by Valerus which created a disruption in my care.

ACTION 30:

In 2014 and 2015

I was ignored and there were several delays in receiving my benefit payments because I was disabled and in retaliation for reporting discrimination.

ACTION 31:

In 2015

In retaliation Valerus delayed my Unemployment Benefits and attempted to get me denied for benefits by lying about the nature of my termination to government.

41

ACTION 32:[6]

In 2015

I was not given my Bonus because I filed a claim with the EEOC.

(Document No. 69-9 at 13-25). As argued by Defendants in their Reply, with the exception of Action 16, Onyeri did not respond to the Motion for Summary Judgment on Actions 1-13, 15, 17-21, 23-25, and 27-32. Onyeri has therefore abandoned those "Actions" as a basis for her Title VII and § 1981 disparate treatment claims. She has also, with the exception of Action 12, also abandoned those "Actions" as a basis for her Title VII retaliation claims.[7] Furthermore, because she did not respond to that part of Defendants' Motion for Summary Judgment, Onyeri has abandoned her claim(s) for hostile work environment,[8] disparate impact discrimination, and violations of the Equal Pay Act. Defendants are entitled to summary judgment on those abandoned claims. *Keenan,* 290 F.3d at 262; *Black,* 461 F.3d at 588 n.1; *Holmes*, 304 F. Supp. 3d at 540–41. That leaves Onyeri's Title VII and § 1981 claims premised on Action 12, 14, 16, 22 and 26, and her disability discrimination claim.

---

[6] In listing the alleged adverse employment actions in her amended interrogatory responses, Onyeri mis-labeled what would be sequentially numbered Action 32, as Action 33.

[7] Action 1, 2, 7, 8, and 9, because they are based on conduct that occurred more than 300 days before Onyeri filed her EEOC charge, because they are complaints about discrete acts, and because Onyeri has not established a hostile work environment claim, are also time-barred.

[8] In a Sur-Reply, Onyeri attempts to resurrect her hostile work environment claim, arguing that she provided, in her response to the Motion for Summary Judgment, "numerous examples of Valerus permitting a work environment that was clearly hostile to [her]". (Document No. 86 at 8). Even if the arguments, raised for the first time in Onyeri's Sur-Reply, were considered on the merits, the admissible contents of Onyeri's Declaration (which is all that she relies on) do not support a conclusion that Onyeri was subjected to severe or pervasive harassment based on her race. Onyeri complains in her Declaration about what she viewed as her heavier workload, her change in positions and her compensation, and her inability to work remotely, but none of those generalized complaints are about conduct that was based on her race or gender, or about conduct that could be characterized as severe or pervasive.

A.        **Title VII and § 1981 Claims**

Of the claims remaining, only Action 14 and Action 16 can be viewed as falling within the realm of a disparate treatment claim.[9]   In Action 14, Onyeri maintains that she was denied the position of project manager, and in Action 16, Onyeri maintains that she was forced into a position in the Supply Chain division so that a white female could take her position as a "Master Scheduler." In her response to Defendants' Motion for Summary Judgment, Onyeri describes her disparate treatment claim as follows:

> Onyeri is an African American female, who is well qualified with two degrees, fourteen certifications, and several years of experience, and was subjected to adverse employment actions when Jackson informed her that her position as Master Scheduler was "going away" and she would have to take a position she did not want under King, or she would be laid off.  In reality, Onyeri was lied to and forced out so that Rachel Miles, a white, less qualified employee, could assume her position. . . . In this case, the adverse employment action was that Onyeri was constructively terminated from her role as Master Scheduler because her management gave her the impression that her position would no longer exist within the company . . .

Response (Document No. 78) at 22.

Onyeri argues that she has established a *prima facie* case of race discrimination, but the summary judgment evidence does not support all of the required elements of a *prima facie* case.

---

[9] Action 12 (cubicle/office space), 22 (performance improvement plan) and 26 (disciplinary action form) are not adverse employment actions for purposes of a disparate treatment claim under Title VII and § 1981.  *See Higbie v. Kerry*, No. 3:11-CV-2636-L, 2014 WL 1012397, at *9 (N.D. Tex. Mar. 14, 2014) (change in office physical location not an adverse employment action), *aff'd*, 605 F. App'x 304 (5th Cir. 2015); *Johnson v. Manpower Prof'l Servs., Inc.*, No. CIV.A. H-09-2423, 2011 WL 689375, at *4 (S.D. Tex. Feb. 17, 2011) ("the location of Plaintiff's office alone, without any adverse effect on his pay, benefits, or level of responsibility, does not constitute an adverse employment action"), *aff'd in part, rev'd in part and remanded*, 442 F. App'x 977 (5th Cir. 2011); *Turner v. Novartis Pharm. Corp.*, 442 F. App'x 139, 141 (5th Cir. 2011) ("placing an employee on PIP is not an ultimate employment decision"); *Roberson v. Game Stop/Babbage's*, 152 F. App'x 356, 360 (5th Cir. 2005) (for a disparate treatment claim, and adverse employment action does not include "events such as disciplinary filings, supervisor's reprimands, and even poor performance").

With respect to her claim that she was denied the position of project manager, Onyeri has not identified, with summary judgment evidence, that she applied for an open position as a project manager, and that the position was filled by someone outside of her protected class.  With respect to the Master Scheduler position, there is no summary judgment evidence that Rachel Miles, or anyone else, "took" Onyeri's Master Scheduler position.  Instead, the summary judgment evidence shows Onyeri went from an Estimator in the Engineering Department to a Master Scheduler in the Supply Chain Department under the supervision of James Jackson in September 2011.  *See* Personnel Action Notice (Document No. 69-29).  The summary judgment evidence also shows that Rachel Miles was a Master Scheduler for Valerus in New Iberia, Louisiana during that same time frame, and remained in that position – in New Iberia, Louisiana – until March 2015, when she was transferred to the Valerus corporate office in Houston.  *See* March 19, 2015 HR PAN (Personnel Action Notice) for Rachel Miles (Document No. 69-26).   Any allegation or suggestion that Rachel Miles "took" Onyeri's Master Scheduler position is refuted by the summary judgment evidence.  *See* Declaration of James Jackson (Document No. 69-1) ("Onyeri's Master Scheduler position was eliminated in 2014.  Rachel Miles did not take Onyeri's eliminated Master Scheduler position.").  Onyeri's subjective beliefs to the contrary, set forth in her Declaration, are not evidence.  As for Onyeri's argument that she was forced out the of the Master Scheduler position when Rachel Miles was not, that argument ignores the fact that Onyeri and Miles worked at different locations, and that Onyeri's Master Scheduler position in Valerus' corporate office was eliminated "as a result of the company's restructuring."  *Id.*  For that reason, Onyeri and Miles, regardless of the positions they held as Master Schedulers, were not similarly situated for purposes of establishing a *prima facie* case of race discrimination. *Wittmer v. Phillips 66 Co.*, 304 F. Supp. 3d 627, 634 (S.D. Tex. 2018) ("To

be considered similarly situated, employees must be in nearly identical circumstances.'"); *Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 259 (5th Cir. 2009) ("Employees with different supervisors, who work for different divisions of a company or who were the subject of adverse employment actions too remote in time from that taken against the plaintiff generally will not be deemed similarly situated.").

Onyeri's *prima facie* case also fails because her transfer from James Jackson's supervision as a Master Scheduler to Bryan King's supervision as a Strategic Source Manager was not an adverse employment action for purposes of a *prima facie* disparate treatment discrimination claim. While a transfer can be an adverse employment action for purposes of a disparate treatment claim if it is '"the equivalent of a demotion' such that the new position proves 'objectively worse,'" *Outley v. Luke & Assocs., Inc.*, 840 F.3d 212, 216 (5th Cir. 2016), here, there is no summary judgment evidence that the Strategic Source Manager position, which came with a raise, was either the equivalent of a demotion, or *objectively* less desirable than the Master Scheduler position.

Because the summary judgment evidence does not support a prima facie case of disparate treatment relative to Action 14 or Action 16, Valerus is entitled to summary judgment on Onyeri's disparate treatment discrimination claims under Title VII and § 1981.

## 2. Retaliation

Based on her Amended Interrogatory responses and her identification therein of alleged retaliatory adverse employment actions, there are four actions that purport to provide the basis for Onyeri's retaliation claim: Action 12 (downgraded to a single cubicle near the bathroom), Action 14 (denied project manager position), Action 22 (being placed on a Performance Improvement Plan) and Action 26 (given a disciplinary action form containing false information/complaints). But

45

Action 12 does not constitute an adverse employment action even for purposes of a retaliation claim, *see Lopez*, 684 F.Supp.2d at 893-94, and Action 14 fails for lack of any evidence that Onyeri applied for and was qualified for an available project manager position.  The summary judgment evidence in this regard is important.  Onyeri's complaints about the downsizing of her cubicle occurred in February 2014, after she had complained to Human Resources about unspecified "unfair" treatment. But Onyeri's move to a smaller cubicle was not specific to her.  Instead, the February 24, 2014, email about the move was directed to over fifty employees, meaning that  Onyeri was not the only employee affected by the move.  *See* Email about "Restack Move #3" (Document No. 78-1).  Furthermore, that downgraded cubicle space was short-lived as Onyeri, upon her transfer to the position of Strategic Source Manager on April 7, 2014, had a dedicated office.  *See* Declaration of G. Bryan King at 3 (Document No. 69-1 at 10) ("When Onyeri joined the Supply Chain Department under me, she was the only employee in the Major Projects team that was provided with a private office, which she kept until taking a leave of absence for short-term disability.").  As for the project manager position Onyeri believes she should have been offered, and its argued connection to an EEOC charge she filed against a former employer, Onyeri has no summary judgment evidence of a causal connection between that previous EEOC charge and any consideration she was given for a project manager position.  In particular, there is no summary judgment evidence that there was an open project manager position, and no summary judgment evidence that any person in a decision making position knew of the EEOC charge she filed against a previous employer.  All there is in the record is Onyeri's speculation, *see* Onyeri Declaration at 8, ¶ 24 (Document No. 78-1 at 8), which, in order to raise a genuine issue of material fact would impermissibly require the Court to pile inference upon inference.  *See Cavazos v. Edgewood Indep. Sch. Dist.*, 400 F. Supp. 2d 948, 964

(W.D. Tex. 2005) ("Plaintiffs are not permitted to pile inference upon inference, nor to rely solely upon conclusory allegations to support their claims."), *aff'd*, 210 F. App'x 414 (5th Cir. 2006). Onyeri has, therefore, not established a *prima facie* case of retaliation based on Action 12 and/or Action 14 and Valerus is, accordingly, entitled to summary judgment on that part of Onyeri's retaliation claim predicated on Action 12 and Action 14.

As for Action 22 and Action 26, assuming, without deciding, that Onyeri has established a *prima facie* case of retaliation attendant to Action 22 or Action 26, the summary judgment evidence does not raise a genuine issue of material fact for trial on whether Valerus' legitimate, non-retaliatory reasons for the alleged adverse employment actions were a pretext for retaliation. Onyeri was issued a performance improvement plan ("PIP") on September 23, 2014, two months after she filed her EEOC charge. As set forth in the PIP itself, the need for improvement was based on:

> Complaints from Project Managers finding you difficult to work with and confrontational when work is requested
>
> Confrontations in meetings when roles and expectations are being clarified
>
> Project Managers and your supervisor find it difficult to locate you during regular business hours
>
> Refusing to do certain tasks that support the progress and vision of the department leadership

PIP (Document No. 69-4). Thereafter, on November 12, 2014, Onyeri was issued a Disciplinary Action Plan, which she refused to sign, and which was based on her confronting "Ebony Page and accus[ing] her of conspiring against her (Ms. Onyeri), i.e. "throwing her under the bus" because she (Ms. Page) met and spoke to Bryan King. Accusing a subordinate of conspiracy is inappropriate." Disciplinary Action Report (Document No. 69-6). In that Disciplinary Action Report, Onyeri was

instructed to "immediately refrain from being retaliatory against any Valerus employee. Any further incidents will be considered as grounds for immediate termination." *Id.*

The stated bases for the  the PIP and the Disciplinary Action Report are legitimate, non-retaliatory reasons for both of those alleged adverse employment actions, which serve to shift the burden to Onyeri to show that Valerus would not have taken the adverse employment action "but for" her filing of an EEOC charge. Onyeri has, however, come forth with no competent summary judgment evidence to meet that burden or raise a genuine issue of material fact. Onyeri states in her Declaration that the contents of the PIP were not true and that several people had denied making complaints against her. Onyeri Declaration (Document No. 78-1) at 12-15. Onyeri also states in her Declaration that she had not confronted Page as described in the Disciplinary Action Form, and had recordings of meetings with Page to prove it. *Id.* at 14. As determined elsewhere, much of Onyeri's statements in her Declaration related to the PIP and Disciplinary Action Form are inadmissible hearsay. Moreover, the summary judgment evidence, including the deposition testimony of Bryan King, Ebony Page, and Jenny Deng, support the contents of the PIP and the Disciplinary Action form. King testified at his deposition that Onyeri was confrontational, passive-aggressive, and spoke over others at meetings. King Deposition at 181-183 (Document No. 69-2 at 47). He also testified that project engineers and managers had problems locating Onyeri during normal business hours. *Id.* at 184-185 (Document 69-2 at 47-48). Ebony Page, who was under Onyeri's supervision at Valerus, also testified at her deposition that she recalled others making complaints about Onyeri's "level of support," her availability, as well as her confrontational attitude during meetings, and detailed a heated confrontation she had with Onyeri, which she reported to King and which then led to the Disciplinary Action form. Page Deposition at 34-44, 56-58 (Document No. 69-5 at 8-10, 14.

48

Onyeri, other than providing rank speculation that retaliation for her filing of an EEOC was the real reason for the PIP and the Disciplinary Action form, has come forth with no evidence to raise a genuine dispute about the contents of the PIP or the Disciplinary Action form.  As such, she has not raised a genuine issue of material fact on pretext and Valerus is, accordingly, also entitled to summary judgment on that part of Onyeri's retaliation claim predicated on Action 22 and Action 26.

### B.    ADA Claim(s)

Onyeri's ADA claim is premised on her June 2015 termination, which she claims occurred while she was off work on disability leave.  According to Onyeri in her response to Defendants' Motion for Summary Judgment, she "was suffering from severe depression, anxiety and nausea which was a physical and mental impairment that substantially limited major life activity," she was "undoubtedly qualified for her position," and that "while still on approved leave and under her physician's care, [Valerus] terminated her, claiming that she had exceeded the allowable leave." Response (Document No. 778) at 29.

Valerus maintains that summary judgment is warranted on Onyeri's ADA claim because the summary judgment evidence, from Onyeri herself at her deposition, is that she was not "qualified," within the meaning of the ADA, for the position she held at the time of her termination – meaning, she could not perform the essential functions of the position with or without reasonable accommodation.  Valerus also maintains that even if Onyeri could establish a *prima facie* ADA claim, there is no summary judgment evidence which raise a genuine issue for trial on whether its legitimate nondiscriminatory reason for her termination was a pretext for disability discrimination.

Under the ADA, an individual is "qualified" if they can "with or without reasonable accommodation [ ] perform the essential functions of the employment position that such individual

holds or desires." 42 U.S.C. 12111(8). "The term essential functions means the fundamental job duties of the employment position the individual with a disability holds or desires. The term ... does not include the marginal functions of the position." 29 C.F.R. § 1630.2(n)(1). Valerus points to Onyeri's deposition testimony admitting that she could not perform the essential functions of her position at the time she went on short-term disability, and was therefore not "qualified" within the meaning of the ADA. Onyeri Deposition at 285 (Document No. 69-12 at 73). But, Onyeri, in response, also points to her own deposition testimony in which she explained that while she could not perform any of the functions of her job at the time she went on short-term disability, she believed that as time went on and with the help of her doctor and some accommodations she would be able to perform the essential functions of her position. *Id.* at 285-291 (Document No. 69-12 at 73-74). Onyeri's deposition testimony, taken as a whole, with all reasonable inferences drawn in a light most favorable to her, does not establish, as a matter of law, that Onyeri was not qualified for the position she held at the time of her termination.

As for Valerus' argument that Onyeri has not pointed to any evidence that would raise a genuine issue of material fact on whether its reason for her termination was a pretext for disability discrimination, the record reveals Onyeri's *argument* that the reason for her termination was false, but there is no summary judgment evidence, whatsoever, that she still had, and was on, approved leave at the time of her termination. What there is in the record is: (1) Onyeri's deposition testimony that Valerus was impeding her transition from short-term to long-term disability, Onyeri Deposition at 285-86 (Document No. 69-12 at 73); (2) Valerus' short term disability policy, which provides benefits for "up to 180 days after a Qualifying Condition has rendered the employee unable to perform his or her normal job duties" (Document No. 69-7); and (3) the Declaration of Miesha

50

Williams, a HR Business Partner at Valerus, in which she states that Onyeri "did not return to work in 2014 after taking leave for short-term disability and did not work at all in 2015.  Onyeri also did not make arrangements with Valerus to return to work in 2015.  After Onyeri's permissible leave and benefits expired and because she did not make arrangements to return to work, Valerus terminated her employment."  Williams Declaration (Document No. 69-1 at 3).  This summary judgment evidence does not, even when all reasonable inferences are drawn in a light most favorable to Onyeri, support the conclusion, or raise a genuine issue of material fact on whether, Valerus' stated reason for Onyeri's termination was a pretext for discrimination.   Onyeri went out on short term disability on November 27, 2014, with the 180 day short term disability period expiring in May 2015.  There is nothing in the record that suggests or shows Onyeri was approved for additional disability leave or that she had, at the time of her termination in June 2015, any additional unused leave.  Onyeri has therefore not raised a genuine issue of material fact on whether Valerus' stated reason for her termination – the exhaustion of her accumulated leave – was false.  She has also not raised a genuine issue of material fact on whether her alleged disability was a motivating factor in her termination. Valerus is, accordingly, entitled to summary judgment on Onyeri's ADA claim.

Having considered the claims Onyeri has not abandoned and all of the summary judgment evidence in the record, the Magistrate Judge concludes that Onyeri has not raised a genuine issue of material fact for trial on any of her claims, and that Valerus is, consequently, entitled to summary judgment on all of her claims.

VI.     **Discussion – Momin**

The uncontested facts related to Abid Momin's employment are that he was hired as a "Buyer" in the Purchasing Group in November 2010, under the supervision of Scott McKinnon, at an annual salary of $50,000.  In August 2011, Aguirre became Momin's direct supervisor. In 2012, Momin's salary increased to $52,500.  In early 2013, Momin was moved to the supervision of Bryan King, the Director of Supply Chain.  In March 2013, King promoted Momin to "Buyer II" and his salary increased to $59,500.   In the spring of 2014, King promoted Momin to the position of Strategic Sourcing Manager, and his salary increased to $70,000.

On July 22, 2014, Momin filed an EEOC Charge, alleging that he had not been promoted as quickly as a White male, and that despite being promoted to Buyer III in 2014, he still made less than his "White" peers.  EEOC Charge (Document No. 70-2).  Over four months later, on December 7, 2014, Momin received a poor performance evaluation.  Approximately a week later, on December 17, 2014, a "Record of Conversation" was entered into Momin's file, which memorialized an impromptu meeting between Leslie Taylor of Human Resources, Bryan King and Momin.  On January 5, 2015, Momin was terminated by email, with the reason for termination being "documented and repeated instances of failure to meet assignment deadlines, attend required meetings, and act upon directive from your supervisor."  Termination email (Document No. 70-8).

In amended responses to Interrogatories, Momin has alleged that he was subjected to thirteen (13) adverse employment actions over the course of his employment.  Again, like Aguirre and Onyeri, some of those alleged adverse employment actions are untimely, some are not adverse employment actions for purposes of a Title VII disparate treatment claim, and some Momin has abandoned by virtue of his failure to address them in response to Valerus' Motion for Summary

52

Judgment.  Those thirteen (13) alleged adverse employment actions upon which Momin bases his

claims of race and national origin discrimination, and retaliation are, by date and description, as

follows:

ACTION 1:
April 2011
I asked if I could get some assistance reviewing an unusually large amount of purchase order lines that I was assigned.  I was responsible for completing over 3,000 purchasing order lines, while my white co-workers were only responsible for completing 224 to 445 orders.  My request was denied and I was told to finish my assignments with urgency.

ACTION 2:
During 2011
Myself, along with other minorities in Supply Chain, are denied offices, that our white co-workers have.  My issues with this unequal and unfair treatment are not addressed.

ACTION 3:
Sometime in the middle of 2011
I was denied additional training resources for new software that was being implemented, even though the training was approved for a couple of my white counterparts.

ACTION 4:
Throughout 2011
I was not offered benefits that were extended to white employees, such as assistance with large workloads, continuing education and software certifications, corporate training, tuition reimbursement, and the opportunity to take Supply Chain classes, despite my repeated requests.

ACTION 5:
During 2012
I requested to receive a cell phone allowance that nearly every white co-worker was receiving because I had to use my personal cellphone for work often, but my request was denied, along with other minorities who were excluded from the benefit.

ACTION 6:
June 2012
I was denied a request for a raise and promotion despite metrics that indicated I had completed at least three hundred purchase orders during the same time period that a white co-worker had only completed one.

ACTION 7:
Around June 2012
I was denied being promoted to Buyer II, when a white male with absolutely no experience in the oil and gas industry was promoted to that position.

ACTION 8:
During 2012
Aguirre requested that I be given a raise, receive additional training and certification for all of the additional workload I had, but these requests were denied.

ACTION 9:
During 2013
I was assigned to supervise four different projects, while a white co-worker with the same title was only responsible for one.  I brought up this discrepancy, but my complaints were ignored.

ACTION 10:
During 2013
I requested an office after recognizing that many of my white co-workers were given offices but had significantly less experience and workloads than me.  My request was denied.

ACTION 11:
May 2014
I went to human resources to complain about the unfair and unequal treatment that I was experiencing under King, but my complaints were never addressed.

ACTION 12:
December 2014-January 5th, 2015
After going to Director of Human Resources Leslie Taylor, with complaints of discrimination, unequal treatment, and harassment, Ms. Taylor compiled a disciplinary "Record of Conversation" between Mr. King, Ms. Taylor and myself. I was ambushed in my cubicle, and given this "record," which was based on false allegations.  Despite my efforts to rectify the matter, I was never able to remove myself from this record.

ACTION 13:
January 5, 2015
I was terminated via email based on the false allegations making up the aforementioned "Record of Conversation."

(Document No. 70-3 at 22-27).

As argued by Valerus in its Reply, Momin did not respond to the Motion for Summary Judgment on Actions 1-4, and has therefore abandoned those "Actions" as a basis for his Title VII and § 1981 disparate treatment claims. In addition, as argued by Valerus, Actions 5-10 are arguably untimely under Title VII,[10] albeit not untimely under § 1981.

## A.    Disparate Treatment Claims under Title VII and § 1981

Although Actions 5-10 are not untimely under § 1981, only Actions 5, 6 and 7 have any arguable basis for being considered an "adverse employment action." Denial of requested training, office/cubicle assignments, and the amount of assigned work, are simply not the type of actions that constitute an adverse employment action for purposes of a disparate treatment claim. *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 407 (5th Cir. 1999) (denial of training is not an adverse employment action for purposes of a disparate treatment claim under Title VII); *Johnson*, 2011 WL 689375, at *4 (S.D. Tex. Feb. 17, 2011) (undesirable office location does not constitute an adverse employment action for purposes of a disparate treatment claim under Title VII), *affirming in part and reversing in part on other grounds*, 442 F. App'x 977 (5th Cir. 2011); *Williams v. Health Tex. Provider Network*, No. 3:16-CV-391-M-BK, 2017 WL 2608813, at *4 (N.D. Tex. June 1, 2017) (Actions such as assigning an employee more difficult work, giving employees unequal break times,

---

[10] While it is arguable that Actions 5-10 are not untimely given the viability of Momin's hostile work environment claim, *see infra* at p. 56-59, they cannot support a disparate treatment claim either because they are not adverse employment actions, or Momin has been unable to establish a *prima facie* case.

and giving allegedly biased annual evaluations are not "adverse actions" within the meaning of Title VII), *report and recommendation adopted*, No. 3:16-CV-391-M-BK, 2017 WL 2616952 (N.D. Tex. June 15, 2017).  In addition, Action 11 – making complaints to Human Resources – is not an adverse employment action for purposes of a disparate treatment claim.  As for Actions 5, 6, and 7, assuming without deciding that each could be considered an adverse employment action, Defendants are correct that Momin has either failed to establish a *prima facie* case of race or national origin discrimination or failed to come forth with summary judgment evidence that would raise a genuine issue of material fact on pretext.

Momin is a member a protected class, in that he is of Indian descent.  In addition, Momin claims, and states in his Declaration, that Valerus denied him tangible, monetary benefits (Action 5: a cellphone allowance) as well as raises and promotions (Action 6 and 7).  What Momin has not shown, with respect to Action 5,  is that a similarly situated employee outside his protected class was given a cellphone allowance when he was not.  The summary judgment evidence shows that in May 2013, Momin was given a cellphone allowance.  Personnel Action Plan (Document No. 84-1).  Other than Momin's own speculation, there is nothing in the record to indicate that anyone similarly situated received a cellphone allowance earlier.

As for his request for a raise (Action 6) and the Buyer II position (Action 7), assuming, without deciding, that Momin could make out a *prima facie* disparate treatment claim, Valerus has articulated a legitimate, nondiscriminatory reason why Richard McClenathen was given a Buyer II position in 2012, and Momin was not.  According to Valerus, and borne out in the summary judgment evidence, Richard McClenathen was hired as a Buyer II in May 2012, at an annual salary of $65,000.  At that time Momin's salary was $52,500, which was considerably less.  But, the

56

summary judgment evidence also shows that Richard McClenathen had an engineering degree, which Valerus valued, as well as supply chain experience.  McClenathen resume (Document No. 70-9).  Momin's degree was in accounting and supply chain management.  Momin Deposition at 12 (Document No. 79-1 at 4).   The differential in position and salary, according to Valerus, was based on McClenathen's degree and supply chain experience.  King Deposition at 134 (Document No. 70-7 at 35).  Momin has not come forth with any summary judgment evidence to challenge this reason, or to show that he was better qualified for the position and salary McClenathen got in 2012.  He has therefore not raised a genuine issue of material fact for trial on pretext.

That leaves intertwined Action 12 and 13 – the December 17, 2014 Record of Conversation, and Momin's termination – which are, arguably, adverse employment actions for purposes of a disparate treatment claim.  But, as argued by Valerus, Momin has not come forth with summary judgment evidence on another essential element of his *prima facie* case – that he was treated less favorably than someone outside his protected class(es).  In particular, Momin has not identified or shown that anyone outside his protected class was able to retain their employment with Valerus when faced with a Record of Conversation similar to his.  Valerus is therefore also entitled to summary judgment on these race and national origin disparate treatment claims.

## B.       Hostile Work Environment Claim

Momin's hostile work environment claim is based on comments directed by King and McKinnon to minorities, referring to them as "the hired help," "minions," and the "clean-up crew," as well as making fun of his ethnicity and ethic name.  Momin states in his Declaration that:

> 4.       It was around this time that Mr. McKinnon and Mr. King began to make fun of my ethnic name by calling me "A-Bid," "A-Quote," "A-Proposal," and "A-Minion," in front of internal stakeholders and peers.  Mr. King and Mr. McKinnon

also began to make remarks to the group I was in, which consisted of minorities. They would refer to us as "the hired help," "minions," and "the clean-up crew," while passing where we sat.

5.      In 2011, when the name calling against myself and my group began, I would bring this to Human Resources attention as well as confront Mr. King and Mr. McKinnon about it.  HR would say they'd look into this, and said that they spoke to King/McKinnon as well but it never stopped.

* * *

16.     All throughout 2012, Mr. King and Mr. McKinnon would continue to call minorities in our group "minions," or "the hired help," or "the cleanup crew."  Mr. King would also call Mr. Canales a "workhorse," and would say that immigrants should go back to their country and improve it.  Mr. King would often say to our group, "convince, conform, or leave."  They would also continue to make fun of my ethnicity and ethnic name.

* * *

23.     All throughout 2013, Mr. King and Mr. McKinnon would call Ms. Aguirre's group "minions," and "the hired help."  They also continued to make fun of my ethnicity, and my ethnic name.  Mr. King would also continue to say "convince, conform, or leave" to the minorities.

* * *

51.     On or around September 16, 2014, I attended a Direct Works training with Joel Rogers, Ms. Onyeri, Mr. McClenathen, Ms. Anton, and Mr. King.  During this training, Mr. King mocks and ridicules my name in front of a third party and admits that previous VP, Scott McKinnon, had done the same.

* * *

65.     All throughout 2014, Mr. King would call minorities "minions," and the "clean-up crew."  Mr. King made a remark in a project meeting to keep the locals away from robbing a plant that was close to the Mexico border and that to get rid of them, they just needed water.  Mr. King would also continue to make fun of my ethnicity and name.  He would tell minority managers that we lacked leadership, maturity, and judgment.  He would also tell us to "convince, conform, or leave."

Momin Declaration (Document No. 79-3).  At his deposition, Momin also testified that

> [t]hey would call me a bid, a proposal, a quote, a minion, and it just went on through – throughout the year. . . . They were calling it directly to me. They were saying a proposal. That's how they referred me to – that's how they introduced me to internal, even external stakeholders, and it started catching on throughout the years, I would make complaints to them saying please stop. I would go to HR. I would say please can you do something about it. It was to a point where I started – I getting – I started isolating myself from everyone else. It was just affecting me in a negative way. I do recall telling HR that I don't understand why I'm being isolated. Can you please help. They said – they would say they will look into it, they're still looking into it, but it just kept going and going.

Momin deposition at 40-41 (Document No. 79-1 at 12). When asked if anyone other than King and McKinnon were making fun of his name, Momin further testified:

> It just caught on. That's how – there was comments. People – I mean my colleagues, my peers were making fun of my name after that. Project managers I was working with would sometimes refer to me as that and I – and I believe there was a comment made and it just – it's – everything started stemming from that. It's – a comment was made that I'm an Indian, not – the Indian with a dot, not the feather. So that's how they were making a separation between what kind of Indian I am and it was – it was just – I didn't understand what was going on at that moment. It was just so much to grasp. That's why I isolated myself hoping that everything would die down.

*Id.* at 48-49 (Document No. 79-1 at 13-14).

Taking Momin's deposition testimony, and the statements in his Declaration in a light most favorable to him, the harassment he complains of was based on his race and/or national origin. In addition, while the harassment was not "objectively severe," Momin's summary judgment evidence does raise a genuine issue of material fact on whether the harassment was pervasive. Momin states in his Declaration that King and McKinnon made fun of his ethnicity and ethnic name "throughout" 2012, 2013 and 2014. While Valerus has submitted, and relies on, King's deposition testimony that King stopped making fun of Momin's name as soon as Momin mentioned he didn't like it, *see* King Deposition at 147 (Document No. 70-7 at 38), Momin's statements in his Declaration and his testimony at his deposition controvert King's testimony about the continued name-calling. That

conflict in the evidence about the pervasiveness of the harassment raises a genuine issue of material

fact on Momin's hostile work environment claim.  *See e.g., EEOC v. WC&M Enterprises, Inc.*, 496

F.3d 393, 400 (5th Cir. 2007) (one year pattern of ridicule was sufficient to raise a genuine issue of

material fact on whether the harassment was pervasive); *Walker*, 214 F.3d at 626 (offensive, racially-

based comments that occurred over a three year period of time were sufficient support a hostile work

environment claim).  Valerus is, therefore, not entitled summary to summary judgment on Momin's

hostile work environment claim.

### C.      Retaliation Claim

Action 12 and 13 form the basis of Momin's retaliation claim.  According to Momin, he

complained to Human Resources in May 2014 about unfair and unequal treatment.  He then filed an

EEOC charge on July 22, 2014.  Four months later he received his first poor performance review,

and a week after that the aforementioned "Record of Conversation."  That December 17, 2014,

"Record of Conversation" made note of Momin's three absences from weekly team meetings, on

November 10, 2014, November 17, 2014, and December 8, 2014, gave Momin a new deadline, of

December 18, 2014, to complete certain tasks on Top 10 Challenge project, and required Momin to

complete "the remaining DirectWorks templates by December 23rd, 2014."  Record of Conversation

(Document No. 70-6).

Despite Valerus' arguments to the contrary, Momin has established a *prima facie* case of

retaliation.  He engaged in protected activity by complaining to Human Resources in May 2014, and

filing an EEOC charge in July 2014.   He suffered an adverse employment action, – the termination

of his employment following the December 17, 2014, Record of Conversation.  And, there is a causal

connection between Momin's protected activity and his ultimate termination.

60

In response to this *prima facie* case of retaliation, Valerus states that it terminated Momin because he failed to meet deadlines contained in the December 17, 2014, Record of Conversation. While that is a legitimate, non-retaliatory reason for Momin's termination, the summary judgment evidence raises a genuine issue of material fact on pretext. That is, in part, because nowhere did Valerus identify which deadline(s) was missed, and because Momin states in Declaration that "after the Record of Conversation meeting, [he] never interacted with Mr. King, or missed any deadlines on my projects to my knowledge." Momin Declaration (Document No. 79-3 at 17). In addition, Momin states in his Declaration that King expressed displeasure with Momin's EEOC charge in November 2014, before he gave Momin a poor performance evaluation and before he "forced him" into an impromptu meeting that resulted in the Record of Conversation. Momin Declaration (Document No. 79-3 at 15) ("Sometime in November 2014, Mr. King threatened me that going through with the EEOC process would not end well for me or those who reported to him."). This summary judgment evidence from Momin, coupled with the fact that Momin was terminated by email while he was on scheduled vacation, *before* he had any opportunity to speak with or interact with King subsequent to the issuance of the Record of Conversation,[11] raises a genuine issue of material fact on whether Valerus' reason is worthy of credence, and whether Valerus would not have terminated Momin "but for" his complaints of discrimination and his filing of an EEOC charge. Summary judgment on Momin's retaliation claim should therefore be denied.

---

[11] The Record of Conversation is dated December 17, 2014. Momin provided a written response to that Record of Conversation on December 19, 2014. According to Momin, King "was on vacation beginning on December 19th, and [he] subsequently took a vacation on December 24th." Momin Declaration at ¶ 64 (Document No. 79-3 at 16).

## VII.    Conclusion and Recommendation

Based on the foregoing, the Magistrate Judge

RECOMMENDS that Defendants' Motion for Summary Judgment against Elizabeth Aguirre (Document No. 68) be GRANTED; Defendants' Motion for Summary Judgment against Kassirim Onyeri (Document No. 69) be GRANTED; and that Defendant Valerus' Motion for Summary Judgment against Abid Momin (Document No. 70) be GRANTED in PART and DENIED in PART, with summary judgment being granted on Plaintiff Abid Momin's Title VII & § 1981 claims of disparate treatment race and national origin discrimination, and denied on Momin's Title VII hostile work environment and  retaliation claim(s).

The Clerk shall file this instrument and provide a copy to all counsel and unrepresented parties of record.  Within fourteen (14) days after being served with a copy, any party may file written objections pursuant to 28 U.S.C. § 636(b)(1)(C), FED. R. CIV. P. 72(b), and General Order 80-5, S.D. Texas.  Failure to file objections within such period shall bar an aggrieved party from attacking factual findings on appeal. *Thomas v. An*, 474 U.S. 140 (1985); *Ware v. King*, 694 F.2d 89 (5th Cir. 1982), *cert. denied*, 461 U.S. 930 (1983); *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982) (en banc).  Moreover, absent plain error, failure to file objections within the fourteen day period bars an aggrieved party from attacking conclusions of law on appeal. *Douglass v. United Servs. Auto. Ass'n,* 79 F.3d 1415, 1429 (5th Cir. 1996).  The original of any written objections shall be filed with the United States District Clerk.

Signed at Houston, Texas, this 23RD day of January, 2019.

Frances H. Stacy
United States Magistrate Judge